## STANDARD OIL CO. v. UNITED STATES et al.

(Circuit Court of Appeals. Fourth Circuit. September 29, 1924.)

No. 2189.

Maritime liens ⟨≡≡30—Furnisher of supplies to vessels sold by Shipping Board on conditional sale contracts held to have no claim for payment against the government or Shipping Board.

Libelant, which furnished fuel and lubricating oil to vessels on orders of the purchaser from the Shipping Board, under conditional sale contracts prohibiting it from imposing liens on the vessels, *held* to have no claim for payment against the vessels, the government, or the Shipping Board.

Appeals from the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose and Morris A. Soper, Judges.

Suit in admiralty by the Standard Oil Company, a California corporation, against the United States, the United States Shipping Board, and others. Decree for respondents, and libelant appeals. Affirmed.

George W. P. Whip, of Baltimore, Md. (Pillsbury, Madison & Sutro, of San Francisco, Cal., and Rawle & Henderson, of Philadelphia, Pa., Lord & Whip, of Baltimore, Md., Felix T. Smith, of San Francisco, Cal., and Joseph W. Henderson, of Philadelphia, Pa., on the brief), for appellant.

F. R. Conway, of Washington, D. C. (A. W. Woodcock, U. S. Atty., of Baltimore, Md., on the brief), for appellees.

Before WOODS and WADDILL, Circuit Judges, and WATKINS, District Judge.

WOODS, Circuit Judge. The Standard Oil Company, in four separate libels in personam against the United States, the United States Shipping Board Emergency Fleet Corporation and L. Vernon Miller, trustee in bankruptcy of the Atlantic, Gulf & Pacific Steamship Corporation seeks to recover $31,502.87 for fuel oil and $338.33 for lubricating oil furnished the steamships Liberator, West Haven, Henry S. Grove, and Charles H. Cramp in June, July, and August, 1922. The District Judge dismissed the libels, without prejudice to the rights of the libelant to file a claim as a general creditor against the bankrupt estate of the Atlantic, Gulf & Pacific Steamship Corporation.

The Shipping Board delivered the vessels mentioned to the Atlantic, Gulf & Pacific Steamship Corporation under identical conditional contracts of sale dated September 24, 1920, November 5, 1920, January 19, 1921, and February 28, 1921, which contained these provisions:

"The buyer shall not suffer to be continued any lien or charge having priority to or preference over the title of the seller in the vessel, or any part thereof, but will in due course and in any event, within fifteen (15) days after the same becomes due and payable, pay or cause to be discharged or make adequate provision for the satisfaction or discharge of all lawful claims or demands which might in equity, in admiralty, or at law, or pursuant to any statute have precedence over the title of the seller as a lien or charge upon the vessel, or any part thereof, or cause the vessel to be released or discharged from any lien therefor. * * * * "

The contract required the purchaser "to carry a properly certified copy of this agreement with the ship's papers, and to take such other appropriate steps designated to it by the seller from time to time as will give notice to the world that the buyer has no right, power, nor authority to suffer or permit to be imposed on or against the vessel any liens or claims which might be deemed superior to or a charge against the interest of the seller in the vessel." We have held in the P. H. Gill & Sons Forge & Machine Works v. United States (C. C. A. 4th Circuit) 1 F. (2d) 964 (opinion filed this day), that these contract provisions forbade the conditional purchaser to place liens on the vessels.

The testimony of officials of the Standard Oil Company proves that before the oil was delivered they knew the vessels were the property of the United States held by the Atlantic, Gulf & Pacific Steamship Corporation under conditional sale agreements. Cashin, a credit official of the Standard Oil Company, testified that Lange, a representative of the Atlantic, Gulf & Pacific Steamship Corporation, promised in response to his request to allow him to inspect the contract, but failed to do so. No further effort on the part of the libelant was made to have access to it and no inquiry was made of the Shipping Board or of the conditional purchaser as to the right of the latter to place liens for supplies on the vessels. Cashin testified that credit reports from the Dun and Bradstreet commercial agencies gave a general statement of the terms and conditions of the sale agreements. These reports were not produced, and it is impossible to tell from the indefinite testimony of the witness what they contained and whether they were received before or after the oil was furnished. It is evident from the record that the officers of the Standard Oil Company considered the vessels and the United States, as

their owner, liable for supplies furnished, and they did not inquire whether the conditional purchaser had a right to bind the vessels or the owner for supplies, because they thought they were under no obligation to inquire.

Counsel for libelant contend that the United States is liable because, as they assert, the oil was furnished on the authority of the Shipping Board. In addition to the provisions of the contract of sale denying authority of the conditional purchaser to place a lien on the vessels contracted for, the Fuel Department of the Shipping Board issued a circular, dated October 1, 1921, headed as its subject, "Policy Governing Delivery of Fuel under Contracts and from Bunker Stations." In this circular the notice was given that "vessels sold under partial payment plans, where agreements have been entered into between the Corporation and the purchaser, entitling the purchaser to receive fuel under contracts and from bunker stations of the Corporation, are *to be supplied only on the basis of cash payment in advance of delivery.*" To this circular was attached a list of "vessels authorized to secure fuel oil under cash payment plan." The Liberator, West Haven, Charles H. Cramp, and Henry S. Grove appear on the list. There is no proof that this circular reached the Standard Oil Company, but the sending of the circular to its agents proved that the Shipping Board intended to give notice that oil was not to be sold on its credit to the ships listed.

Careful examination of all the evidence oral and documentary does not disclose anything done by the Shipping Board or its agents indicating to the libelant or any one else that it intended to waive the provisions of its sale contracts that the conditional purchaser should not put a lien on the vessels. On the contrary, in its two contracts with the Midwest Refining Company for supplying fuel oil to its vessels, it laid down the conditions under which such oil should be furnished. The requirement expressed in one of these contracts was that "the seller shall promptly furnish the Purchasing Department of the buyer at Washington, D. C., semimonthly the original and one copy of the delivery ticket receipted by the chief engineer (for bunkers) or master (for cargo)." The other contract provided that the seller should furnish similar receipted delivery tickets to the Fuel Department of the Board at San Francisco. The knowledge of this requirement was brought home to the Standard Oil Company in a copy of the contract of May 25, 1920, between the Shipping Board and the Midwest Refining Company, which was attached to the Standard Oil Company's own contract with the Midwest Refining Company of July 13, 1920. No delivery tickets nor reports for the delivery of the oil forming the basis of the libels was sent by the libelant to the Shipping Board, either in Washington or San Francisco.

The following testimony was given by George M. Talbot, assistant general manager of the Shipping Board:

"Q. Explain how fuel oil was furnished to purchasers of vessels, the title of which remained in the government, but which for the time being were operated for the account of the purchaser? A. The first procedure was for the purchaser of the vessel, or his representative, to requisition from the district representative of the Emergency Fleet Corporation a certain quantity of fuel oil for a certain vessel, delivery to be made at a certain time. It was then the duty of the representative of the Corporation in that port to approve the requisition, but before placing the order with the supplier to require the purchaser of the vessel to put up a certified check to cover the amount of the delivery. As soon as the Emergency Fleet's representative received that certified check he then placed the requisition approved by himself with the supplier."

This testimony is not contradicted; nor is there a denial of the Standard Oil Company's knowledge of the methods adopted by the Shipping Board in its oil transactions. Alfred J. Turner, a representative of the libelant, testified that in January, 1921, before furnishing lubricating oil to the steamship Charles H. Cramp, Mr. Chisholm, agent of the Shipping Board in San Francisco, advised him that "these ships were being purchased from the Shipping Board, under which condition they could purchase lubricating oils in accordance with Standard Oil Company's contract with the United States Shipping Board." This communication with Chisholm related entirely to lubricating oil for which the Shipping Board had contracted with the Standard Oil Company. The contract with the Standard Oil Company expired October 23, 1921, and the statement of Chisholm in January, 1921, as to deliveries of oil at that time could not have been understood to extend to oil delivered in June, 1922, after the expiration of the contract. Besides, no statement of the lubricating oil furnished in June, 1922, was sent to the Shipping Board as required by the Standard Oil Company's contract.

The evidence shows clearly that the conditional purchasers were forbidden by their contracts to put liens for supplies on the ships, and that the libelant relied on the opinion of its own officers and that of the officers of the conditional purchaser that the ships and the Shipping Board as the owner of them would be liable for oil furnished the conditional purchaser, and that they were therefore under no obligation to inquire into the terms of the conditional sale contracts or the right of the conditional purchaser to bind the ships; that the Shipping Board did nothing to lead the libelant to believe that the Board or the ships would be liable; that any inquiry made of the Atlantic, Gulf & Pacific Steamship Corporation or of the Shipping Board as to the terms of the conditional contract of sale would have disclosed that the conditional purchaser could not bind the ships or the Shipping Board for the purchase price of the oil furnished. The District Judge, therefore, was right in dismissing the libels. United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361; Colonial Beach Co., Owner & Claimant of the Steamer St. Johns, v. Quemahoning Coal Co., 260 U. S. 707, 43 S. Ct. 246, 67 L. Ed. 474; Morse Dry Dock & Repair Co. v. United States (C. C. A. 2d Circuit) 1 F. (2d) 233; P. H. Gill & Sons Forge & Machine Works v. United States (C. C. A. 4th Circuit) 1 F. (2d) 964 (opinion filed this day); Frey & Son, Inc., v. United States (C. C. A. 4th Circuit) 1 F. (2d) 963 (opinion filed this day).

Affirmed.